## CHURCH OF SCIENTOLOGY OF CALIFORNIA, Plaintiff-Appellant,

v.

### Gabriel CAZARES, Defendant-Appellee.

### Nos. 78–3100, 79–1840.

United States Court of Appeals, Fifth Circuit.

March 9, 1981.

---

fees to, Gabriel Cazares, Mayor of the City of Clearwater, Florida at the time this action was commenced.

Count I of the Church's third amended complaint was brought under 42 U.S.C. § 1983 [1] and contended that Cazares, under color of state law, deprived the Church of its civil rights by prohibiting it from practicing its First Amendment privilege of freedom of religion. Count II alleged defamation under Florida law with jurisdiction based on diversity of citizenship.[2]

The district court granted Cazares' motion for summary judgment on Count I finding that: (1) the Church as a corporation did not have standing to assert First Amendment rights of freedom of religion in a civil rights action, and (2) no genuine issue of material fact existed. Summary judgment on Count II was granted on the ground that the statements made by Cazares constituted mere opinions concerning the Church in its role as a public figure. In a subsequent action brought by Cazares and consolidated with the present case for purpose of review, the court found appellant's § 1983 claim groundless, frivolous and unreasonable and awarded attorneys' fees to Cazares.

For the reasons stated below, we disagree with the district court's conclusion that the Church lacked standing to bring an action under § 1983. We hold, however, that the court was correct in granting summary judgment on both counts of the Church's Third Amended Complaint and in finding that because appellant's civil rights claim was groundless, frivolous and unreasonable, appellee was entitled to attorney's fees. Accordingly, we affirm.

Clyde Wilson, Jr., Sarasota, Fla., Bruce S. Rogow, Miami, Fla., for plaintiff-appellant.

John T. Allen, Jr., Walter D. Logan, St. Petersburg, Fla., for defendant-appellee.

Before FAY, KRAVITCH and RANDALL, Circuit Judges.

KRAVITCH, Circuit Judge:

The Church of Scientology of California (the Church) appeals from the district court's entry of summary judgment in favor of, and subsequent award of attorneys'

I. *Background*

In October of 1975, a corporation known as Southern Land and Development and

---

1. At the time this action was commenced, 42 U.S.C. § 1983 provided:

 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitu-

tion and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

2. The original complaint alleged certain defamatory statements as a basis for the § 1983 count. In the third amended complaint, all allegations of defamation were contained in a separate Count II.

Leasing Corporation (hereafter Southern Land Corp.) purchased the Fort Harrison Hotel in downtown Clearwater, Florida. Because the hotel was a city landmark centrally located in the downtown area, the press speculated about the background of Southern Land Corp. and the future use of the hotel. Documents filed in Clearwater City Hall indicated the hotel would be used as a training facility for a large religious organization. Personnel of Southern Land Corp. identified the organization as United Churches of Florida, Inc.

As church employees moved into the hotel, a public controversy arose as to the type of religious organization that would use the facility. News media gave substantial coverage to the developments. On January 28, 1976, appellant Church of Scientology of California announced that it was directly connected with Southern Land Corp. and United Churches of Florida and would be utilizing the hotel for functions of the Church of Scientology of California.

During the progress of the news developments, appellee Gabriel Cazares, Mayor of the City of Clearwater, made statements on numerous occasions speculating as to the identity of the purchaser of the hotel and the purposes for which the hotel would be used. When the Church of Scientology of California revealed it was the true owner of the hotel, Cazares became one of its harshest critics.

According to appellant, Cazares' criticism was unlawful. In its Third Amended Complaint it contended that utilizing his power as Mayor of Clearwater, Cazares interfered with the Church's free exercise of religion by: making false and defamatory remarks, thereby turning the community against the Church and its adherents; inducing clergymen of other faiths to shun association with it and its adherents; inducing local city and state officials to undertake discriminatory and harassing actions and investigations of the Church; inducing civic organizations and other entities to shun association with the Church and its adherents and join public condemnation and ridicule of the Church; inducing the news media to refrain from publishing accurate information and/or favorable comments concerning the Church and to publish only adverse comments and false and derogatory information concerning the Church.

II. *Standing*

In granting Cazares' motion for summary judgment on the § 1983 count, the district court initially addressed the issue of standing. The court recognized that there were two possible theories under which a corporation might bring a civil rights action: (1) to protect the rights of its members; or (2) to protect its own rights as a corporate institution. The court found that the pleadings raised only the latter theory but that the Church would have standing under neither theory because: (1) there were no rights that could not be asserted by an individual member of the Church and no need for the Church to protect the rights of its members; and (2) as a corporation, the Church's right to free exercise of religion was not directly protected by the Civil Rights Act; thus the Church lacked standing to bring suit for the protection of its own rights.

In finding that the Church lacked standing to seek protection of the civil rights of its members the district court interpreted *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) in an unjustifiably narrow manner by requiring the presence of "unusual circumstances" before a corporation could sue on behalf of its members.

In *NAACP*, the State of Alabama brought an action in state court seeking to enjoin the NAACP from conducting activities in Alabama and sought records, including membership lists. The Alabama court held the Association in contempt for noncompliance with the order to produce records revealing the names of its members. NAACP sought certiorari to the United States Supreme Court urging two points: first, that it was constitutionally entitled to resist official inquiry into its membership lists; and second, that on behalf of its members, it was entitled to assert that their

exercise of a right personal to them, namely, their affiliation with the association as revealed by the membership lists, is protected from compelled disclosure. Without deciding whether the NAACP had standing as an institution, the Court noted "that petitioner argues more appropriately the rights of its members, and that its nexus with them is sufficient to permit that it [the NAACP] act as their representative before this Court." 357 U.S. at 458–59, 78 S.Ct. at 1169–70.

One reason the Supreme Court upheld NAACP's standing to assert a constitutional right on behalf of its members was that to have held otherwise would have defeated the purpose of the suit. If the individual members had to be parties, they would have revealed their identity. Though that was certainly a reason for the decision, it was not the only reason. As the Court stated:

> Petitioner is the appropriate party to assert these rights, because it and its members are in every practical sense identical. The Association, which provides in its constitution that "[a]ny person who is in accordance with [its] principles and policies ..." may become a member, is but the medium through which its individual members seek to make more effective the expression of their own views. The reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected if production is compelled is a further factor pointing towards our holding that petitioner has standing to complain of the production order on behalf of its members. *Cf. Pierce v. Society of Sisters*, 268 U.S. 510, 534–536, 45 S.Ct. 571, 573, 69 L.Ed. 1070.

357 U.S. at 459–60, 78 S.Ct. at 1170–71. Nowhere in the opinion does the Court suggest that only in "unusual circumstances" can a corporation sue to protect the rights of its members.[3]

In the present case the district court also denied the Church representational standing because it found there were no rights that could not be asserted by an individual member of the Church, thus there was no need for the Church to protect the rights of its members. An identical argument was implicitly rejected by the Supreme Court in *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). In *Hunt*, a Washington state agency challenged the constitutionality of a North Carolina statute concerning the selling and shipping of apples in North Carolina. North Carolina challenged the commission's standing to bring the action on behalf of Washington state growers and dealers arguing, *inter alia*, that the growers and dealers "are under no disabilities which prevent them from coming forward to protect their own rights if they are, in fact, injured by the statute's operation." 432 U.S. at 342, 97 S.Ct. at 2440. Using the analysis originally set forth in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), discussed *infra*, the Court found standing.

In denying representational standing to the Church, the district court also emphasized that the complaint did not specifically state that the Church was seeking to represent its members in the action. We are unaware of any authority that requires such an explicit statement. Indeed, in *Congress of Racial Equality v. Douglas*, 318 F.2d 95, 102 (5th Cir. 1963), we allowed CORE to assert the constitutional rights of its members although the pleadings did not specifically seek relief on behalf of any member. In that case the district court, at the behest of the Mayor of McComb City, Mississippi, and the owners of a bus station restaurant, enjoined CORE from encouraging blacks to utilize terminal facilities at the bus depot on the ground that CORE intended to provoke breaches of the peace. We reversed, holding that the injunction was an unconstitutional abridgement of First Amendment rights. We noted:

> The injunction, if allowed to stand, would amount to a complete deterrent to the *members* of CORE to demonstrate peacefully against the segregation policies of the City of McComb. *CORE and other*

---

**3.** *But see Alabama Educational Association v. Wallace*, 362 F.Supp. 682, 684 (M.D.Ala.1973).

*organizations,* organized for the purpose of peacefully demonstrating and speaking against unconstitutional state and local laws enforcing segregation, would then find themselves virtually inarticulate.

318 F.2d at 102 (emphasis added). In a vigorous dissent Judge Gewin questioned the grant of first amendment protection to a corporate defendant where pleadings were not filed on behalf of its individual members.[4]

It is thus clear that the requisite for representational standing in this circuit is not necessarily an explicit statement of representation but a close nexus between the organization and its members, *see NAACP v. Alabama,* 357 U.S. at 458–59, 78 S.Ct. at 1169–70, and an allegation of injury to its members as a result of the action. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Such an analysis finds support in *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974), where the Supreme Court held that a union has standing under 42 U.S.C. § 1983 to assert violations of the First Amendment guarantees of freedom of speech and association. In a footnote the Court stated:

In this case the union has standing as a named plaintiff to raise any of the claims that a member of the union would have standing to raise. Unions may sue under 42 U.S.C. § 1983 as persons deprived of their rights secured by the Constitution and laws, *American Fed. of State, Co., & Mun. Emp. v. Woodward,* 406 F.2d 137 (CA8), and it has been implicitly recognized that protected First Amendment rights flow to unions as well as to their members and organizers. *Carpenters Union v. Ritter's Cafe,* 315 U.S. 722 [62 S.Ct. 807, 86 L.Ed. 1143]; *cf. NAACP v. Button,* 371 U.S. 415, 428 [83 S.Ct. 328, 335, 9 L.Ed.2d 405]. *If, as alleged by the union in its complaint, its members were subject to unlawful arrests and intimidation for engaging in union organizational activity protected by the First Amendment, the union's capacity to communicate is unlawfully impeded, since the union can act only through its members. The union then has standing to complain of the arrests and intimidation and bring this action.*

416 U.S. at 819 n.13, 94 S.Ct. at 2202 n.13 (emphasis added).[5]

---

4. Judge Gewin stated:

There is only one appellant, a New York corporation, the Congress of Racial Equality (CORE), and the appellees are C. H. Douglas, Individually and as Mayor of the City of McComb, and Mr. and Mrs. Aubrey McGehee. There is no individual appellant—only a corporate one. Only the appellant CORE is mentioned in the injunctive order. No person but CORE gave notice of appeal. Designation of contents of the record on appeal was given only by CORE. Again, we emphasize that no individual appellant is involved. In spite of this fact, the majority grounds its opinion on the following reason:

"We find that the injunction below is an unconstitutional abridgement of the First Amendment rights, as protected by the Fourteenth Amendment, as a prior restraint on the freedom of speech."

This is the first instance I have found where freedom of speech on the part of a corporate defendant is used as the basis for reversing a trial court in circumstances here present. As stated, the appellant CORE filed no pleadings seeking any relief on its own behalf or on behalf of any individual it claimed to represent; and it offered no evidence. There is

no suggestion of a class action or the appearance of any litigant in a representative capacity.

318 F.2d at 104–05.

5. In a separate opinion, Chief Justice Burger, joined by Justices White and Rehnquist, emphasized that organizations should have standing because they derivatively suffer when their members suffer:

In addition to any individual named appellees the union itself may have standing to challenge the constitutionality of the statutes. The Court has long recognized that the First Amendment's guarantees of free speech and assembly have an important role to play in labor disputes. *Thornhill v. Alabama,* 310 U.S. 88, 102 [60 S.Ct 736, 744, 84 L.Ed. 1093] (1940); *Thomas v. Collins,* 323 U.S. 516, 532 [65 S.Ct. 315, 323, 89 L.Ed. 430] (1945). I agree with the Court that unions, as entities, in addition to union members and organizers, are entitled to the benefit of those guarantees and that a union may sue under 42 U.S.C. § 1983 to enforce its First Amendment rights.

Here the appellee union alleged in the complaint that it was deprived of its constitutional rights of free speech and assembly by the

■ In the present case although the complaint designates only the Church as plaintiff, it alleges the Church is engaged in the "service of the spiritual desires and needs of its numerous members and others throughout the United States and elsewhere ..." and that it owns property in Clearwater upon which it and its members exercise their rights of freedom of religion. The complaint further alleges that the Mayor inflamed public sentiment against the Church and its members and induced other churches and civic associations to shun association with the Church and its members. We believe such allegations demonstrate a sufficient nexus between the Church and its members to permit the Church to act as its members' representative before the court.

In *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), the Supreme Court succinctly set forth the circumstances under which an organization or association has standing to bring an action as the representative of its members:

> Even in the absence of injury to itself, an association may have standing solely as the representative of its members.... The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.... So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper res-

olution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

422 U.S. at 511, 95 S.Ct. at 2211.[6]

■ Thus, in determining whether an association has standing to bring suit on behalf of its members, neither unusual circumstances, inability of individual members to assert rights nor an explicit statement of representation are requisites. An association has representational standing when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington Apple Advertising Commission*, 432 U.S. at 343, 97 S.Ct. at 2441.

■ The prerequisites to associational standing described in *Warth* and reaffirmed in *Hunt* are clearly present here. If, as claimed by the Church, its members were harassed and abused to the extent that they could not freely exercise their religious beliefs, then certainly the members would have standing to sue in their own right. Moreover, according to the complaint, the purpose of the Church is to "service .... The spiritual desires and needs of its numerous members and others throughout the United States and elsewhere ..." It can fulfill this purpose only if its members are allowed to engage in the free exercise of

actions of defendants in enforcing the challenged Texas statutes. If, as claimed by the union, union members were subject to unlawful arrest and threats of arrest in their First Amendment protected organizational activity on behalf of the union, the union would have derivatively suffered or have been in the position to suffer derivatively real injury and would have standing to complain of that injury and bring this action. If a person who was a member of the union both at the time of that person's arrest and at the present time would have standing individually to challenge the constitutionality of one of the five statutes, then the Union itself would have such standing, since the inability of the union member to communicate freely re-

stricts the ability of the union to communicate. As the Court states, *ante*, at 819 n. 13, a union "can act only through its members." 416 U.S. at 829–30, 94 S.Ct. at 2207.

6. *See also Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 39–40, 96 S.Ct. 1917, 1924–25, 48 L.Ed.2d 450 (1976); *Meek v. Pittenger*, 421 U.S. 349, 355–56 n.5, 95 S.Ct. 1753, 1758 n.5, 44 L.Ed.2d 217 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972); *NAACP v. Button*, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963); *National Motor Freight Traffic Ass'n v. United States*, 372 U.S. 246, 247, 83 S.Ct. 688, 689, 9 L.Ed.2d 709 (1963).

their religion. Finally, because the claim asserted and the relief requested affect the membership as a whole, we conclude that the claim does not require individual participation.

We are cognizant that the Supreme Court, in *Harris v. McRae*, —— U.S. ——, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), noted that a free exercise claim is "one that ordinarily requires individual participation." In *McRae* the Court held that the Women's Division of the Board of Global Ministries of the United Methodist Church lacked standing to raise a free exercise challenge to the Hyde Amendment. Because the Women's Division conceded that "the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is diversity of view within ... our membership, and is a determination which must be ultimately and absolutely entrusted to the conscience of the individual before God," the Court concluded that the participation of individual members of the Women's Division was essential to a proper understanding and resolution of their free exercise claims. *Id.* at 2690. In *McRae* only an undetermined percentage of the membership had a personal stake in the controversy, i. e., it was not alleged how many members (1) were eligible to receive Medicaid; (2) were or expected to be pregnant; and (3) as a matter of religious belief would choose to terminate pregnancy by abortion.

The present case differs from *McRae* in a significant respect: the conduct challenged in the complaint uniformly affected the entire membership of the Church of Scientology in Clearwater. The complaint does not allege that the defendant harassed only certain members of the Church; the allegations refer to "the Church, its ministers and adherents." Moreover, the complaint alleges that defendant chilled, deterred, prevented, and inhibited plaintiff in the free exercise of religion, "including use of its property for that purpose." Thus, because the religious activity of the members was inherently intertwined with the services and facilities of the Church, the actions complained of affected every member of the Church in Clearwater. Accordingly, the claims could properly be presented by the Church on behalf of its members.[7]

7. Because we hold that the Church had standing to bring this action on behalf of its members, we need not reach the issue of whether there exist institutional rights of free exercise which the Church had standing to assert. This issue was raised, but not resolved, in *Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310, 313 (5th Cir. 1977) (en banc).

Since our decision in *Brown*, the Supreme Court in *First National Bank v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), has held that corporate speech is protected by the First Amendment, even if the speech does not pertain to the corporation's business or property. *See also Advocates for the Arts v. Thomson*, 532 F.2d 792 (1st Cir. 1976) (corporation as an institution has standing to assert violations of the First and Fourteenth Amendments under 42 U.S.C. § 1983).

In *Bellotti*, the Court did not address "the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment." 435 U.S. at 777, 98 S.Ct. at 1416. However, the Court did offer some guidance in determining which constitutional rights a corporation may assert:

Corporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privi-

lege against compulsory self-incrimination, *Wilson v. United States*, 221 U.S. 361, 382–386 [31 S.Ct. 538, 545–546, 55 L.Ed. 771] (1911), or equality with individuals in the enjoyment of a right to privacy, *California Bankers Assn. v. Shultz*, 416 U.S. 21, 65–67 [94 S.Ct. 1494, 1519–1520, 39 L.Ed.2d 812] (1974); *United States v. Morton Salt Co.*, 338 U.S. 632, 651–652 [70 S.Ct. 357, 368–369, 40 L.Ed. 401] (1950), but this is not because the States are free to define the rights of their creatures without constitutional limit. Otherwise, corporations could be denied the protection of all constitutional guarantees, including due process and the equal protection of the laws. Certain "purely personal" guarantees, such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the "historic function" of the particular guarantee has been limited to the protection of individuals. *United States v. White*, 322 U.S. 694, 698–701 [64 S.Ct. 1248, 1251–1252, 88 L.Ed. 1542] (1944). Whether or not a particular guarantee is "purely personal" or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision.

III. *Civil Rights Claim*

Because of its legal determination that the Church did not have standing to bring the civil rights action, the court granted the Mayor's motion for summary judgment as to Count I without making any specific findings. It concluded, however, that "[b]ased upon the entire record there is no deprivation of the First Amendment right of either the Church or its members."

Under Fed.R.Civ.P. 52(a), findings of fact are not necessary for decisions granting summary judgment.[8] It is only necessary that there be no genuine issue as to any material fact. *Hindes v. United States*, 326 F.2d 150 (5th Cir.), *cert. denied*, 377 U.S. 908, 84 S.Ct. 1168, 12 L.Ed.2d 178 (1964). Here the court determined:

> 435 U.S. at 779 n.14, 98 S.Ct. at 1417 n.14. Thus, the question of whether a corporation may assert a right to free exercise of religion depends on whether the right to free exercise is "purely personal" which in turn depends on the "nature, history and purpose" of the free exercise clause. We leave the answer to this question for another day.
>
> It should be noted, however, that even if a corporation is not entitled to the protection of the free exercise clause of the First Amendment, it would nevertheless have standing to protect its economic and property rights. *See Pierce v. Society of the Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Watchtower Bible and Tract Soc'y v. Los Angeles County*, 181 F.2d 739 (9th Cir. 1950); *Church of God v. Monroe-Ouachita Regional Planning Comm'n*, 404 F.Supp. 175 (W.D.La.1975).
>
> In Paragraph 5 of the Third Amended Complaint, the Church alleges that the Mayor engaged in "in a course of conduct, practice and policy designed to and having the effect of chilling, deterring, preventing and inhibiting Plaintiff in the free exercise of religion under the First Amendment to the United States Constitution, *including use of its property for that purpose* ...." (emphasis added) Construing the complaint liberally, such an allegation might well be sufficient to give the Church standing to sue to protect its right to use its property for the free exercise of its religion. Such an action would, of course, rely more heavily on the Fourteenth than the First Amendment.

**8.** On the other hand, "such findings are helpful to appellate review." *Farbwerke Hoeschst A. G. v. M/V "Don Nicky,"* 589 F.2d 795 (5th Cir. 1979). *See also Melancon v. Insurance Co. of North America*, 482 F.2d 1057 (5th Cir. 1973).

The Court has examined the record in this case carefully and has found no genuine issue of material fact to exist as to Count I. The Court finds only matters of law to be determined.

■ Although we hold that the district court applied an incorrect legal standard in finding the Church without standing, if it is apparent on appeal that no genuine issue of fact exists under the proper legal analysis, we may uphold the grant of summary judgment. *See, e. g., International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. National Right to Work Legal Defense and Education Foundation, Inc.*, 590 F.2d 1139 (D.C. Cir.1978); Fed.R.Civ.P. 56(c).

In the first count of its complaint[9] the Church charged that the Mayor interfered

**9.** Count I of Appellant's Third Amended Complaint states:

*FIRST COUNT*

4. Plaintiff is the beneficial owner of certain real property situate in the City of Clearwater aforesaid, at, from and in the use of which it, its ministers, members and adherents, are and at all relevant times were peaceably exercising or attempting to exercise the right of religion guaranteed by the First Amendment to the United States Constitution.

5. Commencing in January 1976, the Defendant, apprehending that a significant minority of persons in and around the City of Clearwater were intolerant of religious faiths and beliefs other than their own or other traditionally fundamental and orthodox faiths and seeking thereby to gain popularity for himself as a champion of bigotry, willfully and maliciously undertook and has continued to date, using and abusing the full power, prestige and authority of his office as Mayor as aforesaid, to engage in a course of conduct, practice and policy designed to and having the effect of chilling, deterring, preventing and inhibiting Plaintiff in the free exercise of religion under the First Amendment to the United States Constitution, including use of its property for that purpose, and generally to "get rid of" Plaintiff, for no other reason than that he, and those whom he purports to represent, deem the religious beliefs which Plaintiff practices, promulgates and defends to be hateful and heretical.

6. In pursuit of the foregoing alleged practice and policy, the Defendant has, among other things, undertaken:

a. To inflame to the point of potential violence public sentiment against Plaintiff, its

with the Church's right to free exercise of religion by: (1) inflaming public opinion against it; (2) inducing other churches and clergymen to shun association with it and its members; (3) inducing city officials to act against it; (4) inducing state and federal officials to act against it; (5) inducing civic groups to shun association with it and to condemn publicly and ridicule it, its members, and its faith; (6) inducing the media to comment adversely upon it; and (7) creating a public climate such that others would fear to associate with it.

> ministers and adherents, by an unremitting stream of overt and covert communication to others of false and slanted information and otherwise demeaning and contemptuous remarks concerning Plaintiff, including independently actionable defamatory statements as hereinafter more particularly alleged, full well knowing the same to be untrue or misleading, or disdaining any interest in the truth or fairness thereof, and concerning himself only with the tendency of such communications to subject Plaintiff, its ministers and adherents to ridicule, contempt and hatred, and to gain for himself popularity among those predisposed to such sentiments:
>
> b. To induce other churches and clergymen in the Clearwater area to shun association with Plaintiff, its ministers and adherents, and to preach and pray to that end on the grounds that the religious faith espoused by Plaintiff is "anti-Christ" and "Satanic";
>
> c. To induce other officials of the City of Clearwater and the County of Pinellas to undertake discriminatory and harassing actions against and investigations of Plaintiff, including arbitrary denial of otherwise lawfully available religious real property tax exemption, arbitrary requirement by the Fire Marshall for installation on Plaintiff's property of costly fire prevention equipment and measures not required of other property owners in Clearwater, and arbitrary barring of Plaintiff from participation in the City of Clearwater sponsored Bicentennial celebrations. These actions include a memorandum to the City Manager and City Attorney of Clearwater, issued on or about July 10, 1977, a copy of which is attached hereto as Exhibit A.
>
> d. To induce state and federal officials and bodies, including the offices of Governor, the Secretary of State, and the Attorney General of the State of Florida, and the Clearwater Downtown Development Board, to undertake similar discriminatory harassing action against and investigation of Plaintiff. These actions include a letter addressed to

The Mayor moved for summary judgment with a supporting memorandum of law and supporting affidavits from the defendant, a member of the clergy in the Clearwater area, and the city fire marshal. After the Church filed its memorandum in opposition to the motion for summary judgment, the district court granted summary judgment for the Mayor.

The Church claims that the district court erred in granting summary judgment because of the existence of numerous factual disputes, to wit:

> the Honorable Bruce A. Smathers, Secretary of State, sent on or about July 31, 1977, a copy of which is attached hereto as Exhibit C.
>
> e. To induce private civic organizations, including Clearwater Neighbors, Inc., the Clearwater Lions, Kiwanis, Rotary, Executive and Christian Businessmen's Club, the Clearwater Board of Realtors, and the Greater Seminole and Pinellas County Democratic Clubs, to shun association with Plaintiff, its ministers and adherents, and to join Defendant in uninformed public condemnation and ridicule of Plaintiff and the religious faith which it espouses;
>
> f. To induce public news media to refrain from publishing accurate information and/or favorable comment concerning Plaintiff, and to publish only adverse comment, false and derogatory information, and adversely slanted "news"; and
>
> g. Generally, to create a public climate such that third persons, including employees and prospective employees, insurance companies, and others, are literally afraid to contract, associate or sympathize with Plaintiff lest they themselves be subject to loss, injury or public opprobrium.
>
> 7. Defendant's actions and attempted actions, practice and policy above set forth violate Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution to the free exercise of religion and the equal protection of the laws.
>
> 8. Plaintiff has suffered, is suffering and will continue to suffer severe and irreparable injury by virtue of the foregoing. To date, Plaintiff has suffered damage in an amount not less than $1,000,000. Plaintiff has no plain adequate, or complete remedy at law to redress these violations of its constitutional rights, and this suit for injunction, declaratory judgment and damages is the only means of securing complete and adequate relief. No other remedy would offer Plaintiff substantial or complete protection from continuation of Defendant's said acts, practice and policy.

█ (1) *Whether the Mayor improperly influenced the Church's real property tax exemption.* In his deposition, Mark Sableman, a newspaper reporter, claimed that Cazares told him he had visited the deputy property appraiser and handed him a newspaper article in which it was reported that another state had denied the Church of Scientology a tax exemption. · The Mayor stated in his affidavit that he did not attempt to induce county officials to deny arbitrarily the Church a tax exemption. A simple factual dispute, however, if not material, will not stave off a motion for summary judgment. Here the factual dispute was immaterial to the civil rights claim. The property appraiser, in his deposition, stated he did not recall ever meeting the Mayor or seeing the newspaper clipping. Thus, even if the Mayor had actually given the property appraiser the newspaper article, the appraiser's denial that it had any effect on his decision is not controverted.

█ (2) *Whether the Mayor sought to cause an unwarranted FBI investigation of the Church.* According to a memo purportedly written by an FBI member, the Mayor allegedly called the FBI and told the agent that he had information on the Church which might be useful in that "it might constitute a federal violation." The FBI reacted, according to the memo, by reopening its file. In his April 20, 1976 deposition the Mayor admitted talking to the FBI but said nothing came of the conversation. Later in his deposition he said he had no evidence that a crime had been committed.

Even assuming the FBI memo is admissible (which is highly unlikely because there is no sworn testimony to properly identify it), it raises no issue of material fact. There is no evidence that the FBI followed up the call from Cazares with any action that could be considered violative of the Church's civil rights. Neither was the Mayor's calling the FBI a civil rights violation. Not only did he not urge the FBI to do anything against the Church; according to the memo, he said he was not in any particular hurry to discuss the matter further.

(3) *Whether the Mayor had sought to induce action by state officials against the Church.* In a letter which he allegedly wrote to the Secretary of State, the Mayor cited "an apparent infraction of law" committed by the Church. Apparently, Cazares thought the Scientologists might be in violation of Chapters 104 and 106 of the Florida Statutes regarding elections.

█ There is no allegation that any action resulted from the Mayor's inquiry. Presumably, the Secretary of State decided no laws had been broken and the matter was not pursued. Certainly, the Mayor did not violate the civil rights of the Church or its members by pointing out what he thought was an infraction of the law, especially when there was no follow-up on the matter by the authorities.

█ (4) *Whether the Mayor's public statements were the proximate cause of threats of physical attacks on members of the Church and the hostile public climate in the Clearwater area.* There are affidavits that the Church and its members suffered threats of physical harm that interfered with their free exercise of religion. However, there is nothing in the record but the unsupported conjecture of some of the Church members that the Mayor was the proximate cause of their troubles. Many Clearwater residents had strong negative feelings about the Church, much of which stemmed from the methods used by the Church in acquiring the Fort Harrison Hotel and the fear the townspeople had of religious beliefs completely alien to their own. Certainly, the Mayor did little to help matters with his outspoken opposition to the Church. Nevertheless, there is no admissible evidence directly linking the Mayor's public statements to the hostile public climate in Clearwater towards the Church and its members.

█ (5) *Whether the Mayor told an Assistant Attorney General that "he wanted to go on record as vehemently opposed to the closing of the file" on the Church.* Again, this dispute is not material to the legal question of whether the Church's civil

rights were violated. Even if the Mayor was opposed to the closing of the file in question, it apparently was closed by the Attorney General. Neither the Mayor's desire to keep the file open nor the Attorney General's decision to close the file is material to the question of whether the civil rights of the Church or any of its members were violated.

(6) *Whether the Mayor sought to induce businessmen and organizations to shun association with the Church.* Based on the answers in the deposition of Mr. Popp, a local Lutheran Church minister, the Scientologists claim the Mayor intended to convince the business community that it was dangerous to allow the Church quietly to buy property in Clearwater, and thereby to increase its political clout in the area. In his affidavit Cazares states he has never induced civic organizations to shun association with the Church. This, too, does not raise a dispute as to material facts.

 There is no admissible evidence showing that the Mayor's warnings caused a single businessman or organization to shun the Church. This does not mean the Church may not have been shunned; rather, there is no evidence of a nexus between the Mayor's statements and the alleged ostracism.

 The Church identifies a number of other allegedly factual disputes, but these also are either immaterial to the civil rights claim, based on inadmissible evidence, or fail to show a causal relationship between the Mayor and the alleged infringement of civil rights. We agree with the district court's conclusion that no genuine issue of material fact exists as to Count I. The record fails to show that the Mayor deprived either the Church or its members of any First Amendment right. Accordingly, we affirm the grant of summary judgment as to the civil rights claim.

## IV. *The Defamation Action*

In Count II of its Amended Complaint the Church claimed that Cazares maliciously made a number of statements that defamed the Church. In partially granting defendant's Motion to Dismiss, the trial court struck three of the allegedly defamatory statements from the Amended Complaint, holding that they did not state claims upon which relief could be granted based on theories of libel and slander.[10]

---

10. The court struck the allegations contained in paragraphs 9(a), (d) and (f) of the Amended Complaint which state in pertinent part:

*Second Count*

9. Full well knowing the same to be untrue, or with reckless disregard for the truth, the defendant, motivated by actual and utter malice, has made and published false and derogatory statements intended to convey, and reasonably understood by listeners and readers accordingly, that plaintiff does not practice, promulgate, preserve and defend a religious faith, within the meaning of the First Amendment to the United States Constitution, but is a commercial corporation dedicated to fraudulent pursuit of excess profits; that plaintiff is a vile and hateful organization; that plaintiff is a fascist organization dedicated to overthrow of democratic processes and American form of government, by such means as generation of racial hatred and indiscriminate mass murder; and that plaintiff had committed such state and/or federal crimes as unauthorized wire-tapping or other unlawful electronic surveillance. More particularly:

(a) On or about March 12, 1976, in the City of Clearwater, defendant was the guest speaker at a Lions Club luncheon attended by a number of persons whose identities are unknown to plaintiff; during the course of his address to such group of persons, the defendant orally stated and published that plaintiff was not a religious organization as "religion" was understood in the Clearwater area, but "a rip-off, money motivated operation";

. . . . .

(d) On or about January 28, 1976, at his City Hall office in the City of Clearwater, the defendant, referring to plaintiff, orally stated to one Deanna Thompson and/or one Dave Dorney, known to defendant to be reporters for the Clearwater Sun, and knowing that such statement would thereafter be quoted in the public press, that "I don't like paramilitary religious organizations"; thereafter, defendant's said statements were publicly reported in the Clearwater Sun on January 29, 1976, in the form hereto annexed as Exhibit C;

. . . . .

(f) Sometime during April, 1976, the exact date being unknown to plaintiff, defendant, at his City Hall office in the City of Clear-

Discovery proceeded and the Church again amended its complaint. Count II of the Third Amended Complaint alleged that the Mayor maliciously published false and defamatory statements on two occasions.[11] In granting summary judgment for the defendant, the district court found that the Church was a public figure and could recover only by showing the Mayor's statements to be defamatory, false and made with actual malice. The court held that when read in proper context the allegedly defamatory statements constituted mere conclusions or opinions which are constitutionally protected. The court concluded: "The entire record and in particular the articles themselves show that the defendant made no malicious, false statement concerning the plaintiff."

On appeal the Church argues that the Mayor's statements were capable of defamatory meaning and in any event the court should not have decided the question at the Motion to Dismiss and Summary Judgment stages.

---

water, referring to plaintiff, orally stated to one John Marshall, known to defendant to be a reporter for the Toronto, Canada, Globe and Mail, and knowing such statement would thereafter be quoted in the public press, that "they could have sophisticated stuff up there that could be aimed at these windows and pick up anything we're talking about," intending thereby to accuse plaintiff of the commission of state and/or federal crime by indulgence in illicit wire-tapping or electronic surveillance; thereafter, defendant's said statement was publicly reported in Canada in the Toronto Globe and Mail on May 8, 1976, in the form hereto annexed as Exhibit E; later in May, 1976, the exact date being unknown to plaintiff, defendant obtained a copy of said newspaper article from Canada, and caused the same to be re-published in Pinellas County, Florida, by delivery of a copy thereof to one Bob Synder, known to defendant to be an irrationally bigoted individual disposed to use the contents of the same to plaintiff's further injury.

11. Count II of the Third Amended Complaint states in pertinent part:

*SECOND COUNT*

9. Full well knowing the same to be untrue, or with reckless disregard for the truth, the Defendant, motivated by actual and utter malice, has made and published false and derogatory statements intended to convey, and reasonably understood by listeners accordingly, that Plaintiff does not practice, promulgate, preserve and defend a religious faith, within the meaning of the First Amendment to the United States Constitution, but that Plaintiff is a vile and hateful organization; that Plaintiff is a fascist organization dedicated to overthrow of democratic processes and American form of government, by such means as generation of racial hatred and indiscriminate murder. More particularly:

a. On or about February 27 or 28, 1976, either at his home or at his City Hall office or at the office of his attorney in the City of Clearwater, the Defendant entertained representatives of the public news media, at his invitation, for the purpose of disclosing to the latter the fact of his, the said Defendant's, having sued Plaintiff and others in a Florida state court on account of matters collaterally related hereto, "explaining" his "reasons" for so doing, and otherwise taking advantage of public press attention to further his malicious ploy to vilify Plaintiff; during the course of said press conference, the defendant, knowing that his statements would thereafter be quoted in the public press, orally stated to, among others, one Mark Sableman, known to Defendant to be a reporter for the Clearwater Sun, that Plaintiff practiced "ruthless tactics", engaged in "questionable schemes," and was disposed to undertake "assaults on ... business, religious, and government institution," and to "subject Clearwater citizens to untoward actions too bizarre to contemplate," which "would result in a chilling setback to the democratic process with possibly national ramifications", thereafter, Defendant's said statements were publicly reported in the Clearwater Sun on February 28, 1976, in the form hereto annexed as Exhibit B;

b. On or about March 23, 1976, either at his City Hall office or over the telephone, the Defendant orally stated to one Mark Sableman, known to Defendant to be a reporter for the Clearwater Sun, and knowing that such statement would thereafter be quoted in the public press, that "Scientologists are bringing to the city a helter-skelter world and philosophy," full well appreciating in so doing that the term "helter-skelter" had, by reason of a best-selling book and television movie of the same title come into public understanding as descriptive of the policy of generation of racial strife and indiscriminate mass murder allegedly espoused by the infamous and widely publicized Charles Manson, and intending thereby to convey to the public that Plaintiff was dedicated to promotion of generation of racial strife and indiscriminate mass murder; thereafter, Defendant's said statements were publicly reported in the Clearwater Sun on March 24, 1976, in the form hereto annexed as Exhibit D.

■ Because the defamation count was brought as a diversity action, Florida law applies. In *Belli v. Orlando Daily Newspapers*, 389 F.2d 579, 583 (5th Cir. 1967), we stated that under Florida law it was for the trial judge in the first instance to determine whether words are reasonably capable of defamatory interpretation or whether they are necessarily so; it is then for the jury to decide whether they were in fact understood as defamatory. Furthermore, any doubt as to the defamatory effect of the publication should be resolved by the common mind of the jury, and not by even the most carefully considered judicial pronouncement.

Although in *Belli* we reversed because we found that the publication was capable of a defamatory meaning, we did not hold that summary judgments or motions to dismiss are necessarily inappropriate in all defamation cases. In his special concurrence Judge Godbold noted that a judge is not precluded from finding defamation exists as a matter of law. 389 F.2d at 589. Nor is a judge precluded from finding, as a matter of law, that the publication was not defamatory. Thus, in *Southard v. Forbes*, 588 F.2d 140 (5th Cir. 1979), a lawsuit involving a public figure, summary judgment was held to be appropriate on both the questions of defamation and actual malice.

■ In the present case the Church admits it is a public figure within the doctrine of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Thus, the Church may not recover for a simple defamatory statement. The statement must be shown to have been made with "actual malice"—that is with knowledge that it was false or with reckless disregard of whether or not it was false.[12]

■ Under *Gertz v. Welch*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the plaintiff must show also that the defamatory falsehood was a false statement of fact as opposed to pure comment or opinion.

We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. 418 U.S. at 339–40, 94 S.Ct. at 3006–07.

Recent Florida decisions define the law of that state. In *Palm Beach Newspaper, Inc. v. Early*, 334 So.2d 50 (Fla.Dist.Ct.App. 1976), *cert. denied*, 354 So.2d 351 (1977), the court applied the principles of *New York Times* and *Gertz* to defamatory actions in Florida. In *Early* the court overturned a $1,000,000 jury verdict in a libel action brought by a superintendent of schools against a newspaper and certain members of its editorial staff. The court found that words and phrases, such as "cheating," "stealing from the public," and "fingers in the pot," when read in their proper context, were not defamatory. Other charges made by the newspaper were either protected opinion based on fact and thus not false, not made with malice under the *New York Times* standard or "rhetorical hyperbole"— statements made in "the conventional give and take in our economic and political controversies." In holding that there was no defamation, the court stated:

> Suffice it to say that while most of the articles and cartoons can fairly be described as slanted, mean, vicious, and substantially below the level of objectivity that one would expect of responsible journalism, there is no evidence called to our attention which clearly and convincingly demonstrates that a single one of the articles was a false statement of fact made with actual malice as defined in the *New York Times* case.

334 So.2d at 53.

In *Coleman v. Collins*, 384 So.2d 229 (Fla. Dist.Ct.App. 1980), the court reaffirmed the holding of *Early*. The plaintiff in *Coleman*

---

**12.** *See also Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Curtis Publishing Co. v.* *Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Long v. Arcell*, 618 F.2d 1145 (5th Cir. 1980).

was the city attorney for the City of Indian Harbour Beach. The alleged defamatory statement was contained in a memo distributed to residents of the city. This document accused plaintiff of "sneakyly [sic]" including a reverter clause in a deed to the city, and contained the statement "we question the ethics of the . . . City Attorney . . . and we question his fitness to continue to hold that office." Plaintiff sued for defamation the individuals who wrote and distributed the memorandum, and a jury awarded punitive and compensatory damages. The district court of appeals reversed, holding these statements not defamatory as a matter of law. Basing its holding squarely on *Early*, the court found that plaintiff was a public official and that the statements "were clearly matters of opinion, not statements of fact." 384 So.2d at 231.

■ In the present case the Church contends that the following statements allegedly made by Cazares were defamatory:

(1) An article published in the *Clearwater Sun* on March 24, 1976, stated in pertinent part:

After reading extensively in the critical literature concerning Scientology, he [Cazares] has vowed to keep up his opposition.

He has questioned the group's political objectives and has suggested that United Churches was a so-called "gung-ho group" that the Scientologists established "to infiltrate the power structure" of the community.

Gung-ho groups, as described in a 1969 talk given by a Scientologist who founded one such organization in Canada, aim "to influence what the community thinks about Scientology." The groups involve local organizations such as civic clubs in projects for which the gung-ho group gains credit, according to the talk.

The gung-ho groups are names with "an inconspicuous and respectable sounding name—the Citizens' Improvement something or other" and employ "an eye-catching symbol, professionally designed, but not a Scientology symbol . . . incor-

porated in the letterhead and on cards," according to a Scientology document.

Scientology spokesmen contest that description, saying gung-ho groups were not covert and no longer exist. They say United Churches is not a gung-ho group.

But Cazares and other officials are not satisfied, and the Scientologists face a potentially troublesome future if several government agencies considering investigations of the local activities follow through.

Prosecutors at several levels of government, who first looked at the Fort Harrison sale because of the secrecy that surrounded it, are reportedly still following activities. And there has been pressure to have the U.S. Senate constitutional rights subcommittee look at Scientology in its examination of religious cults.

The Scientologists' strongest opponent continues to be Cazares, who takes both the prestige of the mayor's office and the enthusiastic support of many citizens into battle.

Cazares has compared United Churches to the generalized description of gung-ho groups, and he has begun using some of the Scientologists' own language in attacking them.

In Scientology, a "clear" is a person who learns to control his mind fully through counseling. One self-proclaimed clear the Scientologists disavow is mass murderer Charles Manson, subject of a recent book titled "Helter Skelter."

Cazares does not want Scientology clears to take over Clearwater, and he supports the fears of many citizens that Scientologists are bringing to the city a helter-skelter world and philosophy.

"I don't see," Cazares said recently, "how we can allow a group into our town and be gung-ho about it, and be clear in our minds about it, and not go about it in a helter-skelter fashion."

On summary judgment the court held that neither Cazares' use of the phrase "helter-skelter" nor his statements to the press at various times critical of the Church were defamatory.

The Church argues that "helter-skelter" was used by the Mayor in such a way as to convey to the public that the Church was linked to Charles Manson and was dedicated to the promotion of a general policy of mass murder. The Mayor contends that his statement was meant as a joke and that considered in the context in which it was made, it did not attempt to connect the Church with a philosophy of mass murder.

While we do not find the Mayor's "helter-skelter" statement humorous, neither do we consider it defamatory. Reading the statement in context there is no indication that the Mayor was accusing the Church of advocating mass murder. Apparently, "gung-ho" and "clear" have double meanings associated with Scientology. The Church would have us infer that helter-skelter as used in the Mayor's statement refers to the name of a book dealing with Charles Manson. We then must infer that since Manson is considered by some—but not the Church—to be a "clear," the Mayor was trying to connect the Church with Manson. Finally, we are to infer that since Manson was a mass murderer the Mayor's comment suggested Scientology promoted mass murder.

We are not prepared to build inference upon inference in order to find defamatory meaning in a statement. Because the Mayor's statement was not capable of defamatory meaning as a matter of law, the trial court was correct in granting summary judgment. As to the other statements made by the Mayor that were before the trial court on summary judgment, after carefully examining the voluminous record in this case, we agree with the trial court that:

When read in their proper context, the statements made constitute merely conclusions or opinions which express ideas which defendant had concerning a public figure. The defendant is entitled under the public figure doctrine to express his ideas or opinions as long as he does not maliciously make a false statement of fact. The entire record and in particular the articles themselves show that the defendant made no malicious, false state-

ment concerning the plaintiff. Therefore, the Court grants plaintiff's motion for summary judgment as to Count II in its entirety.

(2) An article published in *The Globe and Mail* on May 8, 1976, stated in pertinent part:

Bitter clashes with Clearwater interests have resulted in millions of dollars of claims in lawsuits and counter-suits.

And there's galloping paranoia on all sides.

One example was a worry that the Mayor's office was bugged. Clashing with the cloying music from the ceiling speaker in the office one day was an indecipherable conversation of two men.

"Crossed wires?" said Mayor Gabriel Cazares. "You get paranoid." Shrugging apologetically, he calls for someone to check it out.

"You think maybe speakers can be used in reverse, like microphones," he says.

He's smiling but then he points outside to the upper floors of the Fort Harrison Hotel overlooking everything downtown.

"Some say they could have sophisticated stuff up there that could be aimed at these windows and pick up anything we're talking about."

The "they" to which he referred was what we were talking about: the Scientologists.

(3) An article published in the *Clearwater Sun* on January 29, 1976, stated in pertinent part:

He (Mayor Cazares) questioned United Churches use of armed guards and an elaborate alarm system and the group's policy of not allowing area residents into the building, saying this concept did not fit the basis for religious organizations—"peace and love."

"I don't like paramilitary religious organizations," he remarked.

(4) During a Lions Club luncheon speech, the Mayor stated that the Church of Scientology was not a religious organization as "religion" was understood in the Clearwater area, but a "rip-off, money motivated operation."

The trial court struck the allegations referring to the last three articles quoted above on Cazares' Motion to Dismiss, ruling that they did not state claims upon which relief could be granted based upon theories of libel or slander.

Read in context, the statements by the Mayor quoted in *The Globe and Mail* article were not defamatory. The Mayor did not allege that the Church was engaged in illegal wiretaps. Rather, the Mayor's statements demonstrated a paranoia-like perception of a Scientologist lurking behind every mystery, in this case unknown voices on an office speaker.

Nor do we find Cazares' statement that he did not like paramilitary organizations defamatory. It was simply an opinion based in fact: the statement reflects his perception of the armed guards and security devices.

Finally, the court dismissed as not defamatory the Mayor's characterization of the Church as a "rip-off, money motivated operation." The allegation was struck on a 12(b)(6) motion, Fed.R.Civ.P. For purposes of a motion to dismiss, we must assume the allegations in the petition were correct: that the statement was made, that it was false, and that it was made with malice. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). However, in evaluating the statement to determine whether the words used were capable of defamatory meaning, the words cannot be considered in isolation but must be viewed in the context of the statement as a whole. Here, in comparing the appellant Church to religious organizations as religion is understood in Clearwater, the Mayor termed appellant a money motivated rip-off. Under the most recent articulations of Florida law (*Coleman, supra*, and *Early, supra*), the words

"rip-off," read in context, although uncomplimentary, were not defamatory as a matter of law, and the trial court properly granted defendant's motion to dismiss.

## V. *The Protective Order*

In April and May of 1976, the Mayor was deposed by the Church. Since that time the Church amended its complaint and introduced what it considered to be "new" evidence. In the spring of 1978, the Church sought to depose Cazares again regarding this "new" information and other recent developments in the case. On May 22, 1978, the Mayor moved for a Protective Order, stating that no new issues had been pled since the original deposition. On May 31, the district court granted the Motion for Protective Order, at the same time staying all discovery until the hearing on the Motion for Summary Judgment.

The Church argues that the court erred in limiting the Church's discovery by not allowing it to depose the Mayor nor conduct any further discovery prior to the summary judgment hearing.

The trial court has wide discretion in determining the scope and effect of discovery, *Blum v. Gulf Oil Corporation*, 597 F.2d 936 (5th Cir. 1979), and his rulings are subject to the abuse of discretion standard of review. *Perel v. Vanderford*, 547 F.2d 278 (5th Cir. 1977).

Cazares had been deposed once. The "new" information about which the Church wished to question the Mayor involved no issues of material fact.[13] Given the trial court's knowledge of the discovery situation, the immateriality of the Church's new evidence, and the Church's failure to offer a timely response to Cazares' Motion for a Protective Order,[14] we cannot say the

---

13. This "new" information consisted primarily of: (1) the letter the Mayor allegedly sent to the Secretary of State pointing out what the Mayor thought to be violations of the Florida statutes allegedly committed by the Church; (2) the Mayor's alleged February, 1976 visit to the Attorney General; (3) the Mayor's statements to Reverend Popp; and (4) the Mayor's discussion with the FBI.

14. The Church argues that the court granted the Mayor's Protective Order in nine days when the local rules gave them ten days to respond to the motion. The Church does not allege, however, that they would have responded on the tenth day or that it was in any way harmed by the timing of the district court's action.

trial court abused its discretion in limiting discovery.

## VI. *Attorneys' Fees*

After granting defendant's motions for summary judgment, the district court considered defendant's application, as the prevailing party in the § 1983 count, for the award of attorneys' fees. The court granted the defendant's motion for fees and directed the parties to submit affidavits or other evidence as to the amount thereof.

The court next conducted an evidentiary hearing in which it considered and made findings with regard to each of the criteria suggested in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974). The court's award to Cazares of $36,021.75 in attorneys' fees is appealed by the Church.

In § 1983 actions, awards of attorneys' fees are governed by 42 U.S.C. § 1988, which states in pertinent part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, and 1986 of this title, . . . the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys fee as part of the costs.

The court's discretion is limited, however, to the extent that a prevailing defendant can recover only if the plaintiff's claim was "frivolous, unreasonable, or groundless, or . . . plaintiff continued to litigate after it clearly became so." *Lopez v. Aransas County, Independent School District*, 570 F.2d 541, 545 (5th Cir. 1978), *citing Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978).

In the present case the Church argues the action was not frivolous, unreasonable or groundless because: (1) the court sustained the complaint for over two years; (2) evidence supported the claim; and (3) the judge himself stated the action presented novel legal issues.

 The fact that the court sustained the complaint for over two years is a tribute to the trial judge's patience and fairness, not an indication of his view of the merits.[15] Furthermore, as we pointed out in Part III, *supra*, there was no material, admissible evidence to support the Church's civil rights claim. Moreover, although the judge stated that the action presented novel legal issues, this comment does not preclude a finding that the claim was groundless. Obviously, it was the question of standing, which had little to do with the merits of the claim, that presented the difficult legal issues.

 We agree with the trial court that the civil rights action was frivolous, unreasonable and groundless. Accordingly, an award of attorneys' fees to the defendant was justified.

There is no statute providing for attorneys' fees in a diversity defamation action. Thus, had this suit been brought only on Count II, attorneys' fees would not have been recoverable. Fees were recoverable on Count I, however, and here the court based its award on both the civil rights and the defamation action. The court explained:

> The terms of the statute quoted above [42 U.S.C. § 1988] would not preclude an award for the entire case, and at least one court has found that the provision applies to the entire case where plaintiff joins claims some of which qualify for fees under 42 U.S.C. 1988, and which ordinarily would be tried in one proceeding. *Southeast Legal Defense Group v. Adams*, 436 F.Supp. 891, 894 (D.Or.1977). The Court concludes that attorneys' fees may be awarded for the entire case, if otherwise appropriate.

Several circuits have held that where a civil rights claim is made, a successful claimant may also collect attorneys' fees concerning legal actions or counts which come from or arise out of the same "nucleus of facts."

---

**15.** During these two years, the complaint was amended three times, primarily in order to clarify the defamation claims.

*See Lund v. Affleck,* 587 F.2d 75 (1st Cir. 1978) (award of attorneys' fees proper where plaintiffs prevail on pendent nonconstitutional statutory claim, if civil rights claim substantial and pendent claim arises from same nucleus of facts); *Kimbrough v. Arkansas Activities Association,* 574 F.2d 423 (8th Cir. 1978) (fact that plaintiff prevailed on nonfederal claim did not render inappropriate award of attorneys' fees since constitutional claim was substantial and claims arose from same nucleus of facts); *Seals v. Quarterly County Court,* 562 F.2d 390, 393–94 (6th Cir. 1977) (attorneys' fees justified where plaintiffs filed a voting rights case under § 1983 but actually prevailed on a state claim based on same operative facts). *Maine v. Thiboutot,* —— U.S. ——, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980); *see also* (Attorneys' Fees Act applies to cases decided on statutory as well as constitutional grounds); *Maher v. Gagne,* —— U.S. ——, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980) (in dicta), the Court stated, "Congress intended fees to be awarded where a pendent constitutional claim is involved, even if the statutory claim on which the plaintiff prevailed is one for which fees cannot be awarded under the Act.").

■ In the present case both counts arose out of the same nucleus of facts. Indeed, the first complaint filed by appellant alleged the defamatory statements by defendant as a part of the § 1983 claim. Because a defamation claim may not serve as the basis of a § 1983 suit, appellant was required to amend its complaint and plead the alleged defamation as a separate count. Appellants did not file the Third Amended Complaint until two years after the original complaint. Under these circumstances, it would be impossible to accurately apportion the time appellee's attorneys spent on the civil rights claim and on the nonfederal defamation claim. We hold, therefore, that the district court did not err in granting attorneys' fees for the entire case.

Appellant next argues that the district court erred in awarding attorneys' fees to Cazares in view of the fact that he was covered by insurance. According to the Church, under *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974), a party cannot be awarded a higher fee than he is contractually obligated to pay: since Cazares was covered by insurance, he was not contractually obligated to pay any fee and thus should not be awarded any fee.

■ This argument ignores Cazares' attorney's statements that Cazares' insurance was one of indemnity: that the company was not required to pay unless Cazares was obligated to pay after termination of the case. *See also Perez v. Rodriguez Bou,* 575 F.2d 21 (1st Cir. 1978), where an award of attorneys' fees was not precluded by the fact that the litigants were represented by attorneys of a publicly funded corporation and were not charged for legal services they received in a 42 U.S.C. § 1983 action.

Finally, appellant contends that the court erred in awarding Cazares attorneys' fees without allowing the Church to depose Cazares' attorneys as to the time and nature of their services. Cazares' attorneys argue that the Church's proposed depositions were acts of harassment and that forcing the attorneys to go over their time slips would be an undue burden. The judge issued a protective order and held an evidentiary hearing at which the question of discovery was considered. The court then ordered the case to proceed without further discovery as to the exact amount of time expended by Cazares' attorneys.

■ It does not appear that further discovery was warranted. The Church had interrogated Cazares' attorney at length. The attorney had provided in his affidavit a detailed record of time spent and duties performed. Besides, under *Johnson,* time spent on a claim is only one factor to be considered in the award of fees.

In *Cruz v. Beto,* 453 F.Supp. 905 (S.D. Tex.1977), *aff'd,* 603 F.2d 1178 (5th Cir. 1979), the district court noted:

defendants apparently misconstrue the role of the Court in computing a reasonable fee. The Court is not required to calculate, nor are plaintiffs obligated to prove, a reasonable fee with "mathematical precision". *Johnson, supra* at 720. This is especially true where the need for

documentation and specific listings of times and dates to support plaintiffs' request is at a minimum because of the Court's intimate acquaintance with the litigation. Rather, so long as the Court can reasonably ascertain, either on the basis of supporting time sheets or through its independent perception of counsel's efforts and abilities, that the hours claimed by counsel in their affidavits are a rational reflection of the services performed, the prevailing party will have fulfilled its burden of proof. Thus, although the preferable and less-risky course of action is for counsel to keep detailed time records to be submitted with a fee request, counsel's failure to do so is not fatal to plaintiff's application in this particular case.

■■■ Here, the court indicated it was intimately familiar with the litigation and was satisfied with the correctness of its award which it considered extremely low. We find no abuse of discretion.

In summary, we hold: (1) the Church had representative standing in the § 1983 action; (2) the district court correctly dismissed three allegedly defamatory allegations; (3) the district court correctly entered summary judgment on both counts; (4) the district court correctly found the civil rights claim was frivolous, groundless, and unreasonable and appellee was entitled to attorneys' fees; (5) the fees were properly based upon the entire case, both counts arising from one nucleus of facts; (6) the district court correctly awarded attorneys' fees to Cazares although he was covered by insurance; and (7) the district court correctly refused to allow the Church to depose Cazares' attorneys as to the time and nature of their services.

Accordingly, the judgment is AFFIRMED.