Philip BLANDING, Respondent,

v.

SPORTS & HEALTH CLUB, INC., Appellant.

No. C5–85–305.

Court of Appeals of Minnesota.

Aug. 27, 1985.

Review Granted Oct. 24, 1985.

Ellen Dresselhuis Minneapolis, for respondent.

Clyde F. Anderson, Steven D. Jamar, Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J. and PARKER and FOLEY, JJ., with oral argument waived.

## OPINION

PARKER, Judge.

The Sports & Health Club, Inc., appeals by writ of certiorari from an order of the Minneapolis Civil Rights Commission. The Commission concluded the Club terminated Philip Blanding's membership in the Club because of his affectional preference. It further concluded that the termination of membership constituted a violation of the Minneapolis ordinance prohibiting discrimination in public accommodations because of sexual or affectional preferences. The Commission awarded Blanding compensatory damages, punitive damages and attorney's fees. The Club contends (1) Blanding did not establish that its refusal to readmit him was based on his sexual preference; (2) the imposition of sanctions under the Minneapolis ordinance is unconstitutional because it infringes on the free exercise of

an evangelical religious commitment; (3) the necessity for reasonable rules is an affirmative defense; (4) the award of compensatory damages is not supported by the evidence; (5) Blanding is not entitled to punitive damages; and (6) the award of attorney's fees is improper. We affirm as modified.

## FACTS

The Sports & Health Club offers recreation and exercise facilities to the public. Philip Blanding joined the Club in January 1978 by paying $381.50 for his first 12 months. Under the terms of his membership contract, he was guaranteed a permanent monthly rate of $11 after the first year as long as he maintained his membership. He paid this amount each month until March 1983, when he was suspended. Over the course of his membership he paid $942.50 to the Club.

Blanding exercised regularly at the LaSalle Branch of the Club. Membership at the LaSalle Branch during this period included a significant number of homosexuals.

In July 1979 Blanding wrote to Arthur Owens, president of the Club, taking issue with an editorial Owens had written for the newsletter. In the letter Blanding indicated he was homosexual.

In the latter part of the 1970's some of the homosexuals engaged in open sexual activity and sexual harassment. Heterosexual members also engaged in similar behavior but with less frequency. As a result, the LaSalle management received a number of complaints and some resignations. Sales of membership declined.

Sometime in the early 1980's the Club began "cracking down" on its homosexual members. It enforced special unwritten "sodomite" rules against homosexual members to foreclose opportunities for what it considered to be inappropriate behavior. It required homosexual members to use facilities and services promptly and broke up any congregating or socializing by homosexuals.

The Club put up two bulletin boards. One was entitled "What God thinks of Homosexuality." The other was entitled "Christianity versus False Cults." Staff members talked to homosexuals about their religious views and sexual preference and told them homosexuality was wrong.

On March 17, 1983, there were only a few people at the Club. Blanding and two others were working out on a piece of equipment. When a certain tune was played over the sound system, they discussed whether it was an Irish jig for St. Patrick's Day or something else. One of them said it was a schottische, and Blanding said he would show them how it was done. He did four or five quick steps.

Paul Loso, a staff member, observed the dance step and appeared to be quite distressed, so Blanding left for the locker room. Loso followed Blanding and told him he was disruptive or wrong and was in risk of losing his membership. Blanding responded that he did nothing wrong and asked to be left alone. As he was leaving the Club, Mark Crevier, an owner, told Blanding to come into his office and talk about the situation. When Blanding refused, Crevier said he could no longer be a member. Loso told another member they were "not going to put up with this gay stuff anymore."

Blanding returned to the Club on March 22 but was refused admittance. Loso asked him to return his membership card. The Club manager subsequently wrote to Blanding and said they were "willing to discuss his problem on behavior and attitude" if he was willing to come in.

In August 1983 Blanding joined the Nautilus Fitness Center at a cost of $28 per month.

Blanding filed a complaint with the Minneapolis Civil Rights Commission. At the hearing Crevier testified that Blanding promoted a homosexual atmosphere by chatting with other homosexuals, and that was indecent to him. There was one other allegation that Blanding engaged in indecent behavior.

The Commission found the allegation that Blanding failed to wear modest attire was not supported by the record. It further found there was no parallel between the treatment of Blanding and heterosexual members of the Club. It specifically noted that the privileges of heterosexuals were discontinued only for more egregious acts, such as nudity or overt sexual behavior. The Commission further found the Club effectively terminated Blanding's membership because of his affectional preference and concluded that the Club's differential treatment of Blanding constituted a violation of the Minneapolis ordinance. The Commission awarded $7,466 in compensatory damages, $6,000 in punitive damages, and reasonable attorney's fees and costs in the amount of $4,500.

## ISSUES

1. Is the Commission's determination that the Club refused to readmit Blanding on the basis of his affectional preference rather than on the basis of his conduct supported by the evidence?

2. Is the imposition of sanctions under the Minneapolis ordinance unconstitutional because it infringes on free exercise of an evangelical religious commitment?

3. Are the Club's rules against improper socializing and offensive conduct an affirmative defense against Blanding's complaint?

4. Is the Commission's award of compensatory damages supported by the evidence?

5. Is Blanding entitled to punitive damages?

6. Is the award of attorney's fees improper?

## DISCUSSION

### I

The Club contends Blanding did not establish that the Club's refusal to readmit him was based on his affectional preference. It contends the refusal was based on his conduct. Essentially the Club is argu-

ing that the evidence does not support the Commission's findings. We have reviewed the entire record and conclude that the Commission's findings are clearly supported by the evidence.

The Club admits Blanding was never engaged in the explicit sexual misconduct that gave rise to its decision to make rules against socializing and creating a homosexual environment. The conduct to which it refers is the dancing incident, Blanding's refusal to discuss with Club management the bounds of proper behavior, and his refusal to give assurances that he would not engage in improper behavior.

The Club argues that Blanding was creating a homosexual atmosphere and characterizes the dance as effeminate and done in an obviously homosexual manner. There is no evidence that Blanding's dance was effeminate or done in an obviously homosexual manner. The only reference to the dance was Loso's remark to a member that they were not going to put up with the "gay stuff" any more. Loso did not testify at the hearing.

In its brief the Club also noted that the dance was being done with another man. The other man did a few dance steps in the direction opposite from the one in which Blanding was facing. There is no indication that Loso observed the other man. In fact, the record indicates that he did not.

The Commission found that Blanding impulsively did a four or five-second dance step. It further found that his behavior would not be considered obscene, perverted, or unlawful in the community at large and that membership of heterosexual members was terminated only for more egregious conduct such as nudity or overt sexual acts. The evidence supports these findings and the conclusion that Blanding was effectively terminated because of his affectional preference and not his conduct.

Homosexuals must have the same right to do a quick, impulsive dance step in a public place as other members of society. The discrimination against Blanding is exactly the type of discrimination in public

accommodations that the Minneapolis ordinance was enacted to address. *See Potter v. LaSalle Sports & Health Club*, 368 N.W.2d 413 (Minn.Ct.App.1985).

## II

The Club asserts that the Minneapolis ordinance as applied infringes on the religious freedom of the principals, who are all born-again Christians. It further asserts that their actions regarding Blanding were made in the free exercise of their evangelical religious commitment and are constitutionally protected. Thus, the Club contends that the imposition of sanctions under the Minneapolis ordinance is unconstitutional. The Club undertook no analysis of case law but merely made its assertions.

We conclude that the imposition of sanctions upon the Club is not unconstitutional for two reasons. First, the Club does not have standing to assert the free-exercise clause of the first amendment as a defense to the claims of discrimination. Further, even if the Club could assert the free-exercise rights of its principals, the Minneapolis

ordinance as applied does not impose a burden upon the principals' free exercise of religion.

■ Initially we consider the issue of standing. As a jurisdictional issue, it may be raised at any time. *State v. Sports & Health Club, Inc.*, 370 N.W.2d 844 (Minn. 1985). In this case the issue is not whether the Club has standing to litigate but, rather, whether it has standing to assert the free-exercise clause as a defense to the claim of discrimination. *Id.* There are two possible theories under which an institution might assert the free-exercise clause as a defense: (1) it has institutional rights of free exercise, or (2) it may assert the free-exercise rights of its principals. *Cf. Church of Scientology of California v. Cazares*, 638 F.2d 1272 (5th Cir.1981). The Club makes no assertion that its practices are based upon a genuine belief that it holds, and there are no facts which would support this theory. *See Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 S.Ct. 157 (1983).[1] Rather,

---

1. In *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Supreme Court assumed that an institution could have a sincere religious belief and thus standing to assert the free-exercise clause. Because the issue was apparently never raised and was not discussed in the opinion, we note that the existence or nonexistence of institutional rights of free exercise has been called a "perplexing legal question." *Brown v. Dade Christian Schools, Inc.*, 556 F.2d 310, 313 (5th Cir. 1977). In *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Supreme Court did not address the "abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment." *Bellotti*, 435 U.S. at 777, 98 S.Ct. at 1416. However, the Court offered guidance for determining which constitutional rights a corporation may assert:

Corporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privilege against compulsory self-incrimination, or equality with individuals in the enjoyment of a right to privacy, but this is not because the States are free to define the rights of their creatures without constitutional limit. Otherwise, corporations could be denied the protection of all constitutional guarantees, including due process and the equal protection of the laws. Certain "purely personal" guarantees,

such as the privilege against compulsory self-incrimination, are unavailable to corporations and other organizations because the "historic function" of the particular guarantee has been limited to the protection of individuals. Whether or not a particular guarantee is "purely personal" or is unavailable to corporations for some other reason depends on the nature, history, and purpose of the particular constitutional provision.

*Bellotti*, 435 U.S. n. 14 at 778, 98 S.Ct. n. 14 at 1416 (citations omitted).

The history of the free-exercise clause indicates that it is a purely personal guarantee. It was contained in the celebrated Virginia Act for Establishment of Religious Freedom drafted by Thomas Jefferson and pushed through the Virginia Legislature by James Madison before he played a major role in securing the enactment of the Bill of Rights and in particular the religious clauses of the First Amendment. *Donovan v. Tony and Susan Alamo Foundation*, 722 F.2d 397, 401 (8th Cir.1983) *cert. granted*, —— U.S. ——, 105 S.Ct. 290, 83 L.Ed.2d 226 (1984). Madison considered religion to be a "wholly private matter," *Everson v. Board of Education*, 330 U.S. 1, 39, 67 S.Ct. 504, 523, 91 L.Ed. 711 (1947) (Rutledge, J., dissenting), and this view of religion is reflected in the Virginia statute, which provided:

that all men shall be free to profess, and by argument to maintain, their opinions in mat-

the Club asserts the free-exercise rights of its principals.

■ In *Church of Scientology* the court considered whether a church has standing to bring an action on behalf of its members who claimed they could not freely exercise their religious rights. It applied the three-part test set forth in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Under *Hunt* an association has representational standing when:

(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in a lawsuit.

*Church of Scientology*, 638 F.2d at 1279 (citing *Hunt*); *see also Harris v. McRae*, 448 U.S. 297, 320–21, 100 S.Ct. 2671, 2689–90, 65 L.Ed.2d 784 (1980). While the relationship of the principals to a corporation is clearly different from the relationship of members to an association, the test is helpful, for if a corporation could assert the free exercise of its principals, it would have to meet standards at least as rigorous as those set forth in *Hunt*. In this case the second *Hunt* test is determinative. The Club serves the general public in competition with similar businesses presenting

recreational and exercise facilities. It is a for-profit corporation. The evangelical religious commitment of its principals is not germane to the Club's purpose, profitseeking.

When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.

*United States v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982). Similarly, because Owens and the other principals of the Club have chosen to enter the economic arena as entrepreneurs, they must accept that they cannot attribute their own religious beliefs, however sincere, to their profit-seeking corporation.

This case is unlike *State v. Sports & Health Club, Inc.*, where the corporate veil was pierced and the principals held liable for the illegal actions of the Club. There they could assert their rights of free exercise. Here, it is the Club, not the principals, which has been held liable. Under the circumstances, only the Club's defenses may be asserted. We conclude it has no institutional free-exercise rights or derivative free-exercise rights and thus no standing to assert free-exercise rights as matters of defense.

■ Even if the Club had standing to assert free-exercise rights, its claim that

ters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities * * *.

*Donovan*, 722 F.2d at 401. There was little discussion of the religious clauses in congressional debates, a reflection of the fact that the essential issues had been settled. *Everson*, 330 U.S. at 42, 67 S.Ct. at 524. "Indeed the matter had become so well understood as to have been taken for granted in all but the formal phrasing." *Id.* at 42, 67 S.Ct. at 524. Any understanding based on Madison's beliefs and the Virginia statute would necessarily exclude an institutional right of free exercise. *See also Cantwell v. Connecticut*, 301 U.S. at 303, 60 S.Ct. at 903 ("freedom of conscience and freedom to adhere to such religious organization or form of worship as the individual may choose cannot be restricted by law").

The purpose of the free-exercise clause also indicates that it is purely a personal guarantee. According to the Supreme Court in *Wisconsin v. Yoder*, the free-exercise clause was designed to prevent individuals from being compelled under the threat of criminal sanctions "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Yoder*, 406 U.S. at 218, 92 S.Ct. at 1534. *See also* Clark, Guidelines for the Free Exercise Clause, 83 Harv.L.Rev. 327, 338 (1969) (fairness to the conscientious individual is the major purpose of the free-exercise clause).

Finally, the nature of the free-exercise clause indicates that it is a purely personal guarantee. The religious clause is not merely a statement of the principles of tolerance but a "legislative pronouncement that freedom of conscience and religion are inherent rights of the individual." *Everson*, 330 U.S. at 34, 67 S.Ct. at 520.

the Minneapolis ordinance as applied imposes a burden on those rights would fail. The first amendment prohibits government from regulating beliefs but not conduct.

> The Amendment embraces two concepts—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society.

*Cantwell v. Connecticut*, 310 U.S. 296, 303–04, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). A state cannot attempt to regulate religious beliefs or single out a particular religious belief for adverse treatment, but it can issue neutral regulations which have the effect of interfering with the religious practices of its citizens. *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The Minneapolis ordinance does not attempt to regulate religious belief or to single out a belief for adverse treatment. It is a facially neutral regulation.

■ The Minnesota Supreme Court uses a three-step analysis to determine whether an individual's violation of a facially neutral statute should be exempt under the free-exercise clause of the Constitution:

> 1. Do the requirements of the statute actually impose a burden upon the individual's free exercise of religion;
> 2. If a burden exists, is it justified by compelling government interests; and
> 3. Is the regulation in question the least restrictive means of achieving the State's goals?

*State v. Sports & Health Club, Inc.*, 370 N.W.2d at 851.

■ In considering the first step, we must first determine whether the religious beliefs are legitimate. *See Wisconsin v. Yoder*, 406 U.S. at 214, 92 S.Ct. at 1532. That issue has been resolved in *State v. Sports and Health Club, Inc.* The owners and president of the Club have deeply held and sincere religious beliefs. *Id.* The more difficult question is whether the Minneapolis ordinance, which prohibits discrimination based on affectional preference, actually abridges the principals' religious beliefs. The Club sought no findings either

from the Commission or from the district court that the beliefs of its principals were abridged by the ordinance. Our review of the record yields contradictions. However, based on his understanding of the Bible, Owens (the other principals agree with him) clearly is opposed to homosexual *acts.* The Minneapolis ordinance as applied here deals with discrimination based on affectional preference, not acts. With regard to homosexuals, Owens emphasizes that he has a

> love, a heartfelt love for them, but not for the activity. The same way I would have a heartfelt love for anybody; but as God says in his word, we can hate the sin but we love the sinner * * *. Christ didn't die for me because of my goodness, he died because I was in that situation. It is the same with homosexuals.

We accept Owens' words on their face. *See United States v. Lee*, 455 U.S. at 257, 102 S.Ct. at 1055. From his words it would be difficult to conclude that his Christianity supports discrimination based on preference rather than acts. Thus, the Minneapolis ordinance as applied in this case does not impose a burden upon Owens' free exercise of religion.

Because we conclude there is no burden upon Owens and therefore the Club, we do not reach the next steps in the analysis. However, we note that the Minnesota Supreme Court has recently said that government has "an overriding, compelling interest in prohibiting discrimination in employment and in public accommodation." *State v. Sports & Health Club, Inc.*, 370 N.W.2d at 853.

### III

The Club asserts that conditions at the LaSalle facility made it necessary to implement rules against improper socializing and offensive conduct which creates a homosexual atmosphere. It further asserts that their rules constitute an affirmative defense to Blanding's complaint.

■ We understand that the Club's obligation to its members may necessitate

reasonable rules and regulations. These rules and regulations must be enforced uniformly and without regard to a member's sexual orientation. *Potter.* In this case there is no finding that Blanding's quick dance constituted offensive conduct, and there are no grounds for making such a finding. Given the circumstances, the Club's assertion that its rules are an affirmative defense must fail. *See Potter.*

◼ The Commission also found that Blanding was a victim of harassment. There was evidence that he was prevented from socializing, while heterosexual members were not. Because the rules were not enforced without regard to sexual orientation, the assertion that the rules are an affirmative defense must again fail.

### IV

The Club claims the Commission's compensatory damage award is not supported by the evidence or by law.

◼ The hearing committee of the Commission may order a respondent

> to pay an aggrieved party, who has suffered discrimination, compensatory damages, including damages for mental anguish or suffering * * *.

Minneapolis, Minn., Code of Ordinances § 141.50(1) (1976 & Supp. No. 6, 6–82). The Commission ordered compensatory damages totaling $7,466. Included in this amount is $942.50 which Blanding paid in membership fees. The Club argues that he received the full benefit of his bargain and therefore the award is erroneous. The Commission found that Blanding was a victim of harassment, and thus an award of his fees during the period of harassment is proper. However, Blanding acknowledges that the harassment did not begin until Creviers became manager in 1980. We therefore modify the award of fees. Blanding is entitled to recover fees for the period from 1980 to the termination of his membership.

The Club also argues that Blanding should have mitigated his losses by meeting with Owens and returning to the Club.

The Club is, in effect, asking Blanding to acknowledge that his behavior was improper so that the Club's damages can be reduced. We find no merit to this argument.

◼ The Club further argues that the award of $6,120 to compensate for the additional charges Blanding will incur in maintaining his fitness program is in error because it is too much for three years. The Commission's sum is correct. The error was made in saying it was for three years. The Commission's award is for 30 years. Because the sum was stated correctly, we will not penalize Blanding because of a typographical error describing the period covered.

### V

◼ The Club contends that the Commission's award of punitive damages is improper because Minn.Stat. § 549.20 (1984) requires "clear and convincing evidence that the acts of the defendant show a willful indifference to the rights and safety of others." An award of punitive damages is committed to the Commission's sound discretion and may be modified only if arbitrary and capricious or if unsupported by substantial evidence in the record. *See Continental Can Co. v. State,* 297 N.W.2d 241, 251 (Minn.1980).

◼ The award in this case is supported by substantial evidence and is not arbitrary and capricious. The Club "crack[ed] down" on homosexual members and enforced unwritten "sodomite" rules to foreclose opportunities for what it considered to be inappropriate behavior. It had different expectations for its heterosexual and homosexual members. Its policies led to the suspension of Blanding solely on the basis of sexual orientation. The policies demonstrate a willful indifference to the rights of homosexuals and its conduct is sufficiently egregious to warrant the granting of punitive damages to Blanding. *See Potter.*

### VI

Finally, the Club appeals the Commission's award of attorney's fees, claiming

the Commission's award is unsupported by the evidence. Affidavits submitted on behalf of Blanding's attorneys detail total charges of $3,880.20 for fees and expenses. The Commission concluded that Blanding is entitled "to his reasonable attorney's fees and costs incurred herein in the amount of $4,500."

■■■ Minneapolis, Minn. Code of Ordinances § 141.50(1) provides that the Commission may order "reasonable" attorney's fees. In this case the affidavits are complete only through the hearings. The time necessary to prepare for the final written argument was not covered. We do not find that the award was unreasonable. Respondent has asked for attorney's fees on appeal but has not cited any authority upon which such an award could be made. Accordingly, we cannot make the award.

## DECISION

The evidence supports the Commission's conclusion that the Club effectively terminated Blanding's membership because of his affectional preference and not because of his conduct. The Minneapolis ordinance as applied is not unconstitutional. Under the circumstances of this case, the Club's rules do not constitute an affirmative defense. The award of membership fees for 1978 and 1979 is vacated; the remainder of the compensatory damages are affirmed. Blanding is entitled to punitive damages. The award of attorney's fees is not unreasonable.

Affirmed as modified.

FOLEY, Judge (concurring in part, dissenting in part).

I concur in the result, but also respectfully dissent because I do not believe this court has jurisdiction of this case, and notwithstanding *Hennepin County v. Civil Rights Commission of the City of Minneapolis*, 355 N.W.2d 458 (Minn.Ct.App.1984), this case should be remanded to the Hennepin County District Court.

I do agree with that portion of *Hennepin County* which states:

We agree that by its own terms the APA provides only for review of decisions of agencies with statewide jurisdiction, and does not provide for review of local agency decisions. *See* Minn.Stat. § 1402, subd. 2 and 3 (1982).

*Id.* at 460.

### Minneapolis Civil Rights Ordinance and Minnesota Administrative Procedure Act

1. The Minneapolis Code of Ordinances provides for judicial review of decisions made by the Civil Rights Commission:

Any person aggrieved by a final decision of a hearing committee or a review committee in a contested case, may seek judicial review in the district court as provided in Chapter 15 of Minnesota Statutes, the Administrative Procedure Act, and the District Court shall review the decision in conformance with the provisions of this Title.

Minneapolis, Minn., Code § 141.60(b) (1976 & Supp. No. 6, 6–82). The Administrative Procedure Act formerly Chapter 15 of the Minnesota Statutes, has been renumbered and is now found at Minn.Stat. §§ 14.-01–.70 (1982 & Supp.1983).

In 1982, when the ordinance was promulgated, the APA provided for judicial review in the district court. *See* Minn.Stat. § 14.-63 (1982). Effective August 1, 1983, however, the APA was amended to take into account this court's existence, and § 14.63 now provides for an appeal to this court. *See* 1983 Minn. Laws ch. 247, § 9, at 856 (amending Minn.Stat. § 14.63 (1982)). The statute defining this court's jurisdiction is consistent with the amended APA and gives this court jurisdiction to hear, *inter alia*, "the decisions of administrative agencies in contested cases, as provided in sections 14.63 to 14.69." Minn.Stat. § 480A.06, subd. 4 (Supp.1983).

By its own terms the Administrative Procedure Act does not provide for review of *local* agency decisions. The APA, both formerly and as amended, provides for review of decisions in "contested cases." *See* Minn.Stat. §§ 14.63, 480A.06, subd. 4. A

"contested case" is defined as a "proceeding before an agency," § 14.02, subd. 3, and agencies are defined as bodies having "statewide jurisdiction." Minn.Stat. § 14.02, subd. 2. Because the Minneapolis Civil Rights Commission is an agency of local government rather than an agency with statewide jurisdiction, the decision appealed from was not a decision in a "contested case" as defined by the APA, and thus the combination of § 14.63 and § 480A.06 do not confer jurisdiction on this court to hear the matter.

### Minnesota Constitution

The Minnesota Constitution provides that this court shall have "appellate jurisdiction over all courts, except the supreme court, and other appellate jurisdiction as prescribed by law." Minn.Const., art. VI, § 2. It is well-settled that the words "by law" in the state constitution mean by legislative enactment. *In re Clerk of Lyon County Court's Compensation v. Lyon County Commissioners*, 308 Minn. 172, 174, 241 N.W.2d 781, 783 (1976). Therefore, this court does not have appellate jurisdiction to review decisions of bodies other than courts unless that jurisdiction is conferred by statute.

The APA does not provide statutory authority for this court to hear an appeal from a decision of a *local* agency such as the Minneapolis Civil Rights Commission, as determined above, and therefore the propriety of appeal to this court depends on whether any other statute confers the necessary authority.

### Chapter 82, 1975 Minnesota Laws, and Chapter 363 of the Minnesota Statutes (The Human Rights Act)

Another possible statutory basis for jurisdiction is constructed by a combined reading of special legislation and the Minneapolis ordinance. A 1975 special law gives the Minneapolis City Council the "power" to:

grant to any Minneapolis human rights, human relations, or civil rights commission, department, or director, any and all

powers and duties which are granted by Minnesota Statutes 1974, Chapter 363, to any state human rights, human relations, or civil rights commissioner, department, or state board.

Act of May 2, 1975, ch. 82, § 1, 1975 Minn. Laws 321 (not codified). Chapter 363 (the Human Rights Act) provides:

[A] person aggrieved by a final decision of the department [of human rights] reached after a hearing held pursuant to § 363.071 may seek judicial review in accordance with chapter 14.

Minn.Stat. § 363.072, subd. 1 (Supp.1983).

If we did not apply the general requirement of statewide jurisdiction discussed above, and if a right to obtain judicial review is considered to be a "power," then the authority that derives from the 1975 special law would arguably give this court jurisdiction "prescribed by law" to hear appeals from decisions of the local agency.

This interpretation fails, however, for several reasons. Minn.Stat. § 363.072 speaks of review of a decision "reached after a hearing held pursuant to § 363.071." Although the Commission's hearing is not *literally* pursuant to § 363.071, a functional equivalent to the statutory requirements should be sufficient. Section 363.071 incorporates by reference all of the contested case proceeding provisions of the Minnesota APA, Minn.Stat. §§ 14.57–.62 (formerly §§ 15.0418–.0422). The APA provides a complete framework designed to assure a meaningful and fair a hearing for the aggrieved party and a complete record for the appellate court.

Initially, the Minneapolis Civil Rights Commission does appear to provide procedures for a sufficient hearing. The ordinance provides for a hearing on civil rights complaints "in accordance with Chapter 15 [now renumbered to §§ 14.01–.70] of Minnesota Statutes, the Administrative Procedure Act." Minneapolis, Minn., Code § 141.50(j)(1) (1982). After referring to the APA, however, the Minneapolis Code departs from the APA requirements and sets forth a separate hearing procedure that varies materially from the APA hearing

procedure. For example, a Minneapolis Civil Rights Commission hearing examiner need not fulfill the APA hearing examiner requirements designed to insure a neutral and objective fact-finder ("All hearing examiners shall have demonstrated knowledge of administrative procedures and shall be free of any political or economic association that would impair their ability to function officially in a fair and objective manner." Minn.Stat. § 14.48). The person presiding at a Commission hearing, in contrast, is picked from the members of the commission, Minneapolis, Minn., Code § 141.50(h), and is required to be "known to favor the principles of equal opportunity, nondiscrimination and the objectives of [the Minneapolis Civil Rights Ordinance]," id., § 141.20.

Because of the different hearing procedures, a hearing before the Minneapolis Civil Rights Commission is not the literal or functional equivalent of a "hearing held pursuant to § 363.071," and therefore Ch. 82, § 1, is not sufficient to confer jurisdiction "prescribed by law" on this court to hear appeals from the Minneapolis Civil Rights Commission.

*Minnesota Statutes Chapter 606 (Writs of Certiorari) and Minnesota Statutes Section 480A.60 (Jurisdiction, Court of Appeals)*

The argument has also been advanced that Minn.Stat. § 606.04 (Supp.1983) confers jurisdiction on this court in addition to the jurisdiction provided in § 480A.06, this court's primary source of jurisdiction.

Section 480A.06 confers appellate jurisdiction on this court in the following instances:

Subdivision 1. **Final decisions.** The court of appeals shall have jurisdiction of appeals from all final decisions of the trial courts, other than the conciliation courts, of the state of Minnesota, except that it shall not have jurisdiction of criminal appeals in cases in which the defendant has been convicted of murder in the first degree.

Subd. 2. **Interlocutory decisions.** The court of appeals shall have jurisdiction of interlocutory appeals and other matters as may be prescribed in the rules of appellate procedure.

Subd. 3. **Certiorari review.** The court of appeals shall have jurisdiction to review decisions of the commissioner of economic security, pursuant to section 268.10.

Subd. 4. **Administrative review.** The court of appeals shall have jurisdiction to review on the record the validity of administrative rules, as provided in sections 14.44 and 14.45, and the decisions of administrative agencies in contested cases, as provided in sections 14.-63 to 14.69.

Subd. 5. **Ancillary jurisdiction.** The court of appeals shall have jurisdiction to issue all writs and orders necessary in aid of its jurisdiction with respect to cases pending before it and for the enforcement of its judgments or orders.

Minn.Stat. § 480A.06 (1982).

In 1983 the Minnesota legislature amended Chapter 606 by adding "of appeals" after the word "court." Section 606.04 now provides that the "court of appeals may award double costs" to a party "prevailing on a writ of certiorari in any proceeding of a civil nature." Minn.Stat. § 606.04 (Supp.1983). This addition is argued to confer exclusive jurisdiction on the court of appeals for all writs of certiorari. The argument runs that because petitions for certiorari in economic security cases are already specifically dealt with in Minn.Stat. § 268.10 (Supp.1983), then the reference in § 606.04 to the court of appeals awarding of costs in a certiorari proceeding would be redundant and meaningless if it did not refer to some type of certiorari petition other than one in an economic security case. Because "[e]very law shall be construed, if possible, to give effect to all its provisions," Minn.Stat. § 645.16 (1982), section 606.04, should not be construed in such a way as to render it meaningless or superfluous. A construction that would render § 606.04 not meaningless would be to inter-

pret the section as a broad grant of jurisdiction to this court to hear cases presented by certiorari petitions, such as this appeal from the Minneapolis Civil Rights Commission, for which this court has no other source of jurisdiction.

The argument fails, however. Such a broad and strained interpretation is not necessary to render § 606.04 meaningful. A number of cases come to this court by petition for writ of certiorari in addition to the economic security cases for which "certiorari" is specified in § 480A.06, subd. 3 (Supp.1983). For example, all of the appeals pursuant to the APA which are referred to in *id.*, subd. 4, are now appealed to this court by petition for writ of certiorari. *See* Minn.Stat. § 14.63 (Supp.1983). The reference in § 606.04 is meaningful in reference to those certiorari petitions.

Additionally, another statute refutes a construction of § 606.04 as an exclusive jurisdiction grant to this court for writs of certiorari, even if jurisdiction could be conferred by such indirect language. The supreme court is given a broad power in Minn.Stat. § 480.04 (1982) to issue writs of certiorari "whether especially provided for by statute or not." The existence of this statute requires that § 606.04 be given its logical reading of allowing costs in writs of certiorari brought before the court of appeals, rather than requiring all writs of certiorari to be brought here.

This decision does not leave decisions of local agencies such as the Minneapolis Civil Rights Commission without review. Appropriate review is provided in the district courts pursuant to Minn.Stat. § 484.01 (1982), which gives the district court original jurisdiction in all "special proceedings not exclusively cognizable by some other court or tribunal." Writs of certiorari are special proceedings within the meaning of our statutes. *State v. Civil Service Commissioner*, 278 Minn. 296, 301, 154 N.W.2d 192, 196 (1967).

In dissenting here, I am mindful that the 1985 legislature has amended Section 480A.06, subd. 3, with respect to certiorari review. *See* Act of May 20, 1985, ch. 165 § 1, 1985 Minn.Sess. Law Serv. 5 (West).

In whatever other instances the newly amended statute might be applicable, the law in force at the time review was taken to this court read differently and the new statute does not apply to this case.

POPOVICH, Chief Judge (dissenting).

1. I respectfully dissent on several grounds. However, I totally agree with this court's assumption of jurisdiction. In *County of Hennepin v. Civil Rights Commission of Minneapolis*, 355 N.W.2d 458 (Minn.Ct.App.1984), this court considered whether the district court had jurisdiction in an appeal from the Minneapolis Civil Rights Commission and affirmed a district court decision dismissing a petition for review for lack of jurisdicition. There were no dissents. *County of Hennepin* is a well-reasoned opinion which concludes jurisdiction in this court is grounded upon a legislative grant of power.

A recent appeal made directly to this court from a Minneapolis Civil Rights Commission decision was also affirmed without dissent. *See Potter v. LaSalle Sports & Health Club*, 368 N.W.2d 413 (Minn.Ct. App.1985). A dissent now on jurisdictional grounds denies precedent and is unwarranted.

2. There exists no constitutional right to homosexual activity, private or public. As recently as 1985, in *Dronenburg v. Zech*, 741 F.2d 1388, *reh'g en banc denied*, 746 F.2d 1579 (D.C.Cir.1984), it was held that private, consensual, homosexual conduct is not constitutionally protected. The court stated:

More to the point, the Court in *Doe v. Commonwealth's Attorney for Richmond*, 425 U.S. 901 [96 S.Ct. 1489, 47 L.Ed.2d 751] (1976), summarily affirmed a district court judgment, 403 F.Supp. 1199 (E.D.Va.1975), upholding a Virginia statute making it a criminal offense to engage in private consensual homosexual conduct. The district court in *Doe* had found that the right to privacy did not extend to private homosexual conduct be-

cause the latter bears no relation to marriage, procreation, or family life. 403 F.Supp. at 1200. The Supreme Court's summary disposition of a case constitutes a vote on the merits; as such, it is binding on lower federal courts.

\* \* \* \* \* \*

\* \* \* The Court has listed as illustrative of the right of privacy such matters as activities relating to marriage, procreation, contraception, family relationships, and child rearing and education. It need hardly be said that none of these covers a right to homosexual conduct. \* \* \* We would find it impossible to conclude that a right to homosexual conduct is "fundamental" or "implicit in the concept of ordered liberty" \* \* \*.

\* \* \* \* \* \*

\* \* \* We have no guidance from the Constitution or, as we have shown with respect to the case at hand, from articulated Supreme Court principle. If courts of appeals should, in such circumstances, begin to create new rights freely, the volume of decisions would mean that many would evade Supreme Court review, a great body of judge-made law would grow up, and we would have "preexempt[ed] for [ourselves] another part of the governance of the country without express constitutional authority." If the revolution in sexual mores that appellant proclaims is in fact ever to arrive, we think it must arrive through the moral choices of the people and their elected representatives, not through the ukase of this court.

Turning from the decided cases, which we do not think provide even an ambiguous warrant for the constitutional right he seeks, appellant offers arguments based upon a constitutional theory. Though that theory is obviously untenable, it is so often heard that it is worth stating briefly why we reject it.

Appellant denies that morality can ever be the basis for legislation or, more specifically, for a naval regulation, and asserts two reasons why that is so. The first argument is: "if the military can defend its blanket exclusion of homosexuals on the ground that they are offensive to the majority or to the military's view of what is socially acceptable, then no rights are safe from encroachment and no minority is protected against discrimination." Appellant's Opening Brief on Appeal at 11–12. Passing the inaccurate characterization of the Navy's position here, it deserves to be said that this argument is completely frivolous. The Constitution has provisions that create specific rights. These protect, among others, racial, ethnic, and religious minorities. If a court refuses to create a new constitutional right to protect homosexual conduct, the court does not thereby destroy established constitutional rights that are solidly based in constitutional text and history.

Appellant goes further, however, and contends that the existence of moral disapproval for certain types of behavior is the very fact that disables government from regulating it. He says that as a matter of general constitutional principle, "it is difficult to understand how an adult's selection of a partner to share sexual intimacy is not immune from burden by the state as an element of constitutionally protected privacy. That the particular choice of partner may be repugnant to the majority argues for its vigilant protection—not its vulnerability to sanction." Appellant's Opening Brief on Appeal at 13. This theory that majority morality and majority choice is always made presumptively invalid by the Constitution attacks the very predicate of democratic government. When the Constitution does not speak to the contrary, the choices of those put in authority by the electoral process or those who are accountable to such persons, come before us not as suspect because majoritarian but as conclusively valid for that very reason. We stress, because the possibility of being misunderstood is so great, that this deference to democratic choice does not apply where the Constitution removes the choice from majorities.

Appellant's theory would, in fact, destroy the basis for much of the most valued legislation our society has. It would, for example, render legislation about civil rights, worker safety, the preservation of the environment, and much more, unconstitutional. In each of these areas, legislative majorities have made moral choices contrary to the desires of minorities. It is to be doubted that very many laws exist whose ultimate justification does not rest upon the society's morality. For these reasons, appellant's argument will not withstand examination.

*Id.* at 1391–97 (citations omitted) (footnote omitted). It seems clear that when an anti-discrimination ordinance conflicts with the first amendment's freedom of religion, the first amendment should prevail. In addition, it should be noted that sodomy is still a crime in Minnesota. Minn.Stat. § 609.293 (1984).

3. I respectfully disagree with the determination that the Club does not have standing to assert the free exercise clause as a defense to the claims of discrimination. The Club is a closely held corporation. The owners and operators, Arthur Owen, Mark Crevier and Forrest Larson, are all born-again Christians whose fundamentalist religious convictions "require them to act in accordance with the teachings of Jesus Christ and the will of God in their business as well as in their personal lives." *State ex rel. McClure v. Sports & Health Club, Inc.*, 370 N.W.2d 844 (Minn.1985). If their religious practices conflict with state requirements, their closely held corporation must be able to assert their free exercise rights as defense. Otherwise, these three men would be effectively precluded from entering the marketplace. Can it be said that a professional person who incorporates a sole professional corporation loses all constitutional rights because of the incorporation? Such a result would be absurd. Individuals of strong religious convictions do not live in a vacuum or practice their faith only on their days of worship. Religious values should and do permeate a person's daily activities.

The distinction between institutional rights of free exercise and a corporation's assertion of the free exercise rights of its principals is a distinction without a difference when a corporation is closely held. While such a distinction might be pertinent under different factual circumstances, it is unimportant here. The Club operates as a reflection of its principals' religious beliefs. In order for Owens, Crevier and Larson's free exercise rights to be protected, the Club must be able to assert those rights.

4. I also disagree with that portion of the decision that makes a finding with regard to Owens' religious beliefs. Such a finding must be made by the administrative body. Our role is to review the finding, if requested, to determine whether it is supported by substantial evidence. Therefore, I would remand for further findings.

It should be noted that courts are not arbitrators of scriptural interpretation. The application and interpretation of religious beliefs and teachings "is not within the judicial function and judicial competence." *Thomas v. Review Board of Indiana Employement Security Division,* 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981).

5. I finally disagree with the award of damages. After Loso observed Blanding's dance, he told Blanding it was "disruptive" or "wrong" and he was in *risk* of losing his membership. Blanding's membership was not terminated until *after* he refused to talk about the situation with management. Compensatory damages were $7500, punitive damages $6000, attorney's fees and costs $4500, for a total award of $18,000. This seems excessive as I view the Health Club's conduct as being more of elementary rudeness. The basis for the award, that Blanding will incur additional charges in the next 30 years, is speculative. There are dozens of health facilities of various kinds in the Twin Cities area available to him. The punitive damages statute was aimed at serious, wanton, and malicious conduct of a degree higher than is found in this case.

Even if the Club is wrong in their claim that they were exercising a religious right, their action was based upon a sincere defense based upon their religious principles. There should have been solid findings of fact that the act was egregious and proven malicious. There was no evidence that because Blanding was no longer a member of the Health Club that he lost any friends, suffered any private or public embarrassment, was prevented from getting a job, was hindered in advancing in any way, or suffered any direct or indirect economic loss.

Blanding's refusal to talk exacerbated an otherwise small incident which in itself did not result in a loss of Club membership. Thus, his refusal to discuss the situation constitutes a proper defense for the Club.

While I have the deepest compassion for those discriminated against in any way, I must apply the law as I interpret it to be.